UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

TAMIKA HARTLEY,

                    Plaintiff,              Case Number 16-10916

v.                                      Honorable David M. Lawson

DENISE ARMSTRONG, ALAN GREASON,         Magistrate Judge Patricia T. Morris
DAVID JOHNSON, RODERICK KILGORE,
SONAL PATEL, and ANTHONY STEWART,

                    Defendants.

_____/

**OPINION AND ORDER REJECTING REPORT AND RECOMMENDATION,
SUSTAINING DEFENDANTS' OBJECTIONS, GRANTING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT, AND DISMISSING THE
AMENDED COMPLAINT WITH PREJUDICE**

Plaintiff Tamika Hartley, a state prisoner confined at the Michigan Department of

Corrections's (MDOC) Women's Huron Valley Correctional Facility (WHV), filed a civil rights

complaint in this case alleging that her constitutional rights were violated when she was subjected

to more than 30 months in administrative segregation after she committed several serious assaults

on fellow prisoners. The case was referred to Magistrate Judge R. Steven Whalen to conduct

pretrial proceedings, and upon Judge Whalen's retirement it was reassigned to Magistrate Judge

Patricia T. Morris. After a lengthy period of discovery, several defendants were dismissed, and

the remaining defendants filed a motion for summary judgment. On September 8, 2021, Judge

Morris filed a report recommending that the defendants' motion be denied. The defendants filed

objections, and the case is before the Court for fresh review.

In their motion, the defendants all have argued that they are entitled to qualified immunity

against the plaintiff's sole claim that they violated her Fourteenth Amendment Due Process rights

by imposing the lengthy period of segregation and declining her requests for reclassification to the

prison's general population.  The magistrate judge concluded that Hartley had established a liberty interest because the length of the confinement in administrative segregation — 30 months — amounted to an atypical and significant hardship beyond what a prison inmate should expect as part of her sentence.  There likely is enough evidence in the record to support that conclusion.  The magistrate judge also determined that Hartley was denied adequate process because many of the monthly reviews for continued segregation amounted to a "perfunctory rubber stamp" and were not meaningful.  That is a much closer call.  Finally, the magistrate judge believed that Hartley's constitutional right to a regular meaningful review was clearly established at the time, and therefore the defendants are not entitled to qualified immunity from Hartley's claim.  Here, the Court must part company with the magistrate judge.  Qualified immunity is intended to protect state actors from suit when they act in situations where the constitutional right is not clearly delineated under the specific facts of the case.  Viewing the facts most favorably to the plaintiff, the Court must conclude that the defendants' classification of the plaintiff for administrative segregation and their gradual reclassification of her over 30 months did not violate a clearly-established constitutional right under the Fourteenth Amendment.  The defendants' objections are well founded on that score.  The Court therefore will reject the report and recommendation, sustain the defendants' objections, grant the motion for summary judgment, and dismiss the plaintiff's claims against all defendants.

## I.

The basic facts of the case not disputed.  However, the defendants take issue with some of the inferences the magistrate judge drew when she characterized the rationale, or lack of it, for justifying the plaintiff's continued placement in administrative segregations after the monthly

reviews.  The plaintiff has not identified any material fact question that would upset the defendants' interpretation of the record.

In September 1993, Hartley was convicted on state charges of second-degree murder and sentenced to at least 22 and up to 45 years in prison.  She has resided in MDOC custody at the WHV facility since her conviction.

The defendants are various prison officials who were involved with the plaintiff's security classification and reviews of her custodial placement during the 2013-2016 timeframe covered by the amended complaint.  Defendants Alan Greason and Roderick Gilmore were Resident Unit Managers at WHV.  Defendant Denise Armstrong was a Unit Chief at the prison.  Defendants David Johnson and Sonal Patel were Deputy Wardens.  Defendant Anthony Stewart was the prison's Warden.  All were employed by the MDOC.

The administrative record produced during discovery discloses the following history of serious assaults for which the plaintiff was cited and disciplined while in prison.  All of the following incidents preceded the violation and segregation at issue in the present complaint.  Hartley does not complain about the handling of those earlier misconduct citations and sanctions.

On October 20, 2000, the plaintiff was found responsible after a disciplinary hearing for assaulting another prisoner by throwing scalding hot water in her face, which caused serious burns requiring hospitalization.  Hr'g Report dated Oct. 20, 2000, ECF No. 67-7, PageID.513.  On May 19, 2005, after a second hearing, the plaintiff was convicted of grabbing another prisoner by the throat and punching her in the face.  Hr'g Report dated May 19, 2005, ECF No. 67-8, PageID.520.  On September 4, 2006, after a hearing on a third discipline report, the plaintiff again was found to have assaulted another prisoner by repeatedly punching her in the face.  Hr'g Report dated Sept. 4, 2006, ECF No. 67-9, PageID.523.  For that offense, Hartley was placed in administrative

segregation from October 8, 2006 through January 2007.  On February 6, 2007, after a hearing on

a fourth incident, prison authorities again determined the plaintiff had assaulted a fellow prisoner

by hitting her in the face.  That incident occurred on January 27, 2007, soon after the plaintiff had

been released from administrative segregation for the earlier assault.  Hr'g Report dated Feb. 6,

2007, ECF No. 67-12, PageID.531.  The plaintiff again was placed in administrative segregation,

apparently, until sometime in March 2007.  After a fifth disciplinary hearing, the plaintiff again

was found to have assaulted a fellow prisoner by kicking her.  Hr'g Report dated Nov. 8, 2007,

ECF No. 67-15, PageID.542.  She was again placed in administrative segregation, this time from

November 6, 2007 through December 4, 2007.

Approximately a year later, on December 23, 2008, the plaintiff committed a more serious

assault on a fellow prisoner by slashing her face with a razor.  Hr'g Report dated Jan. 6, 2009.

After the sixth disciplinary hearing, she was held in administrative segregation through June 8,

2009, and she also separately was convicted on state charges of felony assault.  Then, on July 8,

2009, barely a month after her release from segregation, the plaintiff committed a seventh assault

on a fellow prisoner by slashing her back with a razor.  Hr'g Report dated July 22, 2009, ECF No.

67-21, PageID.567.   For that seventh assault, the plaintiff was returned to administrative

segregation and placed and held there from September 2009 through July 2010.

No further serious incidents of misconduct were reported over the three years following

the plaintiff's July 2010 release from segregation until the incident leading up to the plaintiff's

claim in this case.  On August 12, 2013, the plaintiff was found to have seriously assaulted another

prisoner by slashing her arm with a razor.  Hr'g Report dated Aug. 19, 2013.  The prisoner was

taken to the hospital for treatment of the resulting laceration.  The plaintiff again was placed in

administrative segregation on September 18, 2013, where she remained through March 2016, when

she was returned to the general population.  The initial reclassification notice stated that the plaintiff had "[d]emonstrated an inability to be managed with general population privileges," and that she was determined to be a "serious threat to the physical safety of staff and/or other prisoners."  Security Reclassification Notice dated Sept. 18, 2013.

The plaintiff admits that from September 2013 until November 2013, she "declined to attend weekly Security Classification Committee ('SCC') meetings," according to her because she had been told by both the prison's deputy warden and by the corrections officer who had written the misconduct report for her latest assault that she could expect a minimum one-year term in segregation, and she therefore believed that the weekly hearings were "merely perfunctory."  Am. Compl., ECF No. 49, PageID.337-38.  Despite her election not to participate in weekly security committee discussions, prison records show that the plaintiff's security classification was reviewed monthly from October 2013 through March 2016.  Segregation Behavior Reviews dated Sept. 25, 2013 through Mar. 3, 2016, ECF No. 67-4, PageID.459-494.  The reviews indicate that the plaintiff participated in SCC meetings starting in November 2013.

The reviews throughout the 30-month period of segregation generally indicated that the plaintiff — at least after she was placed in restrictive custody — was "good" and "compliant" with "no problems," generally "quiet" or only moderately talkative, and "cooperative" with prison staff. However, each review recited the same verbatim determination that segregation should be continued due to the plaintiff's 2013 misconduct citation for a serious assault and her "history of [assaultive] behavior."  Sixteen months later, beginning in January 2015, the plaintiff was placed on a "mental health management plan," under which she was allowed a series of expanded privileges, with the stated goal of eventually returning her to the general population.  *See* Mental Health Management Plan dated Jan. 26, 2015, ECF No. 67-5, PageID.497.  She was allowed

increasingly permissive privileges including more time in the prison dayroom, more yard time, phone calls, and more frequent showers. Those amenities gradually were expanded on a monthly basis until the plaintiff eventually was reclassified to the general population in March 2016. Segregation Behavior Review dated Mar. 10, 2016, ECF No. 67-4, PageID.495.

The plaintiff filed her civil rights complaint in this case on March 7, 2016 — three days before her release from segregation. The Court assigned *pro bono* counsel to represent the plaintiff, and the case was referred to the assigned magistrate judge for management of all pretrial matters. Hartley's complaint pleads a single claim via 42 U.S.C. § 1983 for violation of the plaintiff's Fourteenth Amendment right to due process, based on the allegedly atypical and significant hardship of a 30-month stay in administrative segregation, which the plaintiff says was continued without meaningful interim review of the custodial classification.

In the report and recommendation, Magistrate Judge Morris concluded that the claims should proceed to trial because (1) the record suggests that the period of segregation in this case was "atypical and significant," because there were no "extenuating circumstances" similar in nature to, for example, a need to complete an ongoing investigation of violent conduct, such as have been found to justify lengthy periods of segregation in other cases, and (2) questions of fact remain about whether the plaintiff received any "meaningful review" of her security classification during the 30-month stay in segregation, based on the "rote recital" of verbatim grounds for continuing the segregation which were stated in monthly security review forms. The defendants filed three objections to the recommendation for denial of their motion for summary judgment. The plaintiff has not filed a rebuttal to those objections.

- 6 -

II.

"The filing of objections provides the district court with the opportunity to consider the specific contentions of the parties and to correct any errors immediately," *Walters*, 638 F.2d at 950, enabling the court "to focus attention on those issues-factual and legal-that are at the heart of the parties' dispute," *Thomas v. Arn*, 474 U.S. 140, 147 (1985). As a result, "'[o]nly those specific objections to the magistrate's report made to the district court will be preserved for appellate review; making some objections but failing to raise others will not preserve all the objections a party may have.'" *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 837 (6th Cir. 2006) (quoting *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987)).

The defendants objected to the recommendation arguing that (1) controlling circuit law holds that a two-year classification to administrative segregation does not qualify as an atypical and significant hardship sufficient to support a Fourteenth Amendment claim, where the plaintiff has a long history of serious assaultive behavior, (2) the magistrate judge's conclusion that the plaintiff did not receive "meaningful review" of her security classification is contrary to the record because it overlooks detailed reports about the plaintiff's good behavior and the increasingly permissive allowances of privileges during the "mental health management" or "step-down" plan starting in January 2015, and (3) there is no clearly established law holding that "classifying a prisoner to administrative segregation for two-and-a-half-years for her repeated violent attacks on other prisoners and resultant security risk violates her constitutional rights," and "[c]ontrolling precedent shows the opposite is true."

A.

The plaintiff's amended complaint pleads a single claim under 42 U.S.C. § 1983 alleging violations of her due process rights. To state a claim under that statute, a plaintiff must allege that

(1) she was deprived of a right, privilege, or immunity secured by the federal Constitution or laws of the United States; and (2) the deprivation was caused by a person acting under color of state law. *Flagg Bros. v. Brooks*, 436 U.S. 149, 155-57 (1978); *Harris v. Circleville*, 583 F.3d 356, 364 (6th Cir. 2009); *Brock v. McWherter*, 94 F.3d 242, 244 (6th Cir. 1996).

The plaintiff relies on the Fourteenth Amendment for the substance of her claim. "The Fourteenth Amendment's Due Process Clause protects individuals against the deprivation of life, liberty, or property without due process." *Robinson v. Amble*, No. 18-2176, 2019 WL 5152775, at *2 (6th Cir. July 17, 2019) (citing *Wilkinson v. Austin*, 545 U.S. 209, 221 (2005)). "'[T]hose who seek to invoke its procedural protection must establish that one of these interests is at stake.'" *Ibid.* (quoting *Wilkinson*, 545 U.S. at 221). For prisoners challenging the constitutionality of disciplinary sanctions, it is well settled that "[a] prison disciplinary action does not implicate a liberty interest requiring due process safeguards unless the punishment imposed will inevitably affect the duration of an inmate's sentence or inflict an 'atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.'" *Ibid.* (quoting *Sandin v. Conner*, 515 U.S. 472, 484 (1995)).

"Discipline by prison officials in response to a wide range of misconduct falls within the expected perimeters of the sentence imposed by a court of law." *Sandin*, 515 U.S. at 485. Even where the sanction for misconduct is "concededly punitive, [such treatment typically] does not present a dramatic departure from the basic conditions of [an inmate's custodial] sentence." *Ibid.* "In order to determine whether segregation of an inmate from the general prison population involves the deprivation of a state-created liberty interest protected by the due process clause, courts are to determine if the segregation imposes an 'atypical and significant' hardship on the inmate 'in relation to the ordinary incidents of prison life.'" *Jones v. Baker*, 155 F.3d 810, 812

(6th Cir. 1998) (quoting *Sandin*, 515 U.S. at 483).  The Sixth Circuit has adopted the approach endorsed by other circuits, which instructs that, when assessing whether a period of administrative segregation is "atypical and significant" in the context of ordinary prison life, courts should "consider [both] the nature of the more-restrictive confinement and its duration."  *Harden-Bey v. Rutter*, 524 F.3d 789, 793 (6th Cir. 2008).

If it is determined that an inmate's confinement in administrative segregation implicates a liberty interest, then courts must decide what process is due.  It is generally agreed that "prison officials must engage in some sort of periodic review while an inmate is confined in administrative segregation, and that the officials' decision to continue such confinement must be supported by some evidence."  *Selby v. Caruso*, 734 F.3d 554, 559 (6th Cir. 2013) (quotation marks and citations omitted).

## B.

The defendants all assert that they are entitled to qualified immunity against the plaintiff's Fourteenth Amendment claim.  Once that defense is raised, the plaintiff is obliged to demonstrate both that the challenged conduct violated a constitutional right and that the right was clearly established at the time.  *McDonald v. Flake*, 814 F.3d 804, 812 (6th Cir. 2016) (citing *Quigley v. Tuong Vinh Thai*, 707 F.3d 675, 680 (6th Cir. 2013)).  "If the plaintiff fails to establish either element, the defendant is immune from suit."  *T.S. v. Doe*, 742 F.3d 632, 635 (6th Cir. 2014).  However, when the qualified immunity defense is raised in a motion for summary judgment, courts must weave the summary judgment standard into each step of the qualified immunity analysis.  *Scott v. Harris*, 550 U.S. 372, 378 (2007).  That means that the Court must view the facts in the light most favorable to the plaintiff, *Saucier v. Katz*, 533 U.S. 194, 201 (2001); "[i]n qualified immunity cases, this usually means adopting . . . the plaintiff's version of the facts," *Scott*, 550

- 9 -

U.S. at 378.  The Court may take up the two questions presented by the qualified immunity analysis in either order, *Pearson v. Callahan*, 555 U.S. 223, 236 (2009), and in this case the defense can be addressed by focusing on the second element.

"A right is 'clearly established' if '[t]he contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" *Baynes v. Cleland*, 799 F.3d 600, 610 (6th Cir. 2015) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). Even when there is no case defining a constitutional right that directly mirrors the fact pattern confronted by the defendant, "'an official can be on notice that his conduct violates established law even in novel factual situations.'" *Cahoo v. SAS Analytics Inc.*, 912 F.3d 887, 898 (6th Cir. 2019) (quoting *Littlejohn v. Myers*, 684 F. App'x 563, 569 (6th Cir. 2017); *Hope v. Pelzer*, 536 U.S. 730, 731 (2002)).  The touchstone of the "clearly established" inquiry is "fair warning." *Baynes*, 799 F.3d at 612-13 (quoting *Hope*, 536 U.S. at 741).  "Qualified immunity ordinarily applies unless it is obvious that no reasonably competent official would have concluded that the actions taken were unlawful." *Chappell v. City of Cleveland*, 585 F.3d 901, 907 (6th Cir. 2009). And because the defense must be applied to specific situations, courts "must not 'define clearly established law at a high level of generality.'" *Tlapanco v. Elges*, 969 F.3d 638, 649 (6th Cir. 2020) (quoting *Kisela v. Hughes*, --- U.S. ---, 138 S. Ct. 1148, 1152 (2018)).

This defense insulates state actors from liability in close-call situations.  *See Saucier*, 533 U.S. at 206 (explaining that the defense is intended to protect state actors who must operate along the "hazy border" that divides acceptable from unreasonable conduct).  The purpose of the defense is to strike a balance that "accommodates the tension between permitting litigants to recover damages, which is often the only realistic avenue for vindication of constitutional guarantees, and the social costs of such suits, including the expenses of litigation, the diversion of official energy

from pressing public issues, and the deterrence of able citizens from acceptance of public office." *Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 900 (6th Cir. 2004) (quotation marks and citation omitted).

The defendants argue that it is far from clear that the administrative segregation in this case triggered a liberty interest, and a reasonable person in the defendants' positions would believe that the periodic reviews of the plaintiff's confinement status provided the process that she was due. The Court agrees. The undisputed material facts in the record show that the defendants' conduct fell within the wide range of discretion jailers have to manage prison conditions. The factual record that has been presented cannot sustain the Fourteenth Amendment claim against the defense that no reasonable prison official in the defendants' positions would have been under fair warning that their conduct violated clearly established law.

### 1.

The length of the administrative confinement in this case was significant, but in light of the circumstances that prompted the placement and justified its continuance, reasonable officials would not have been on alert that the segregation was "atypical and significant." Pertinent to that determination are both "the nature of the more-restrictive confinement and its duration." *Harden-Bey v. Rutter*, 524 F.3d 789, 793 (6th Cir. 2008). The parties' presentations and the magistrate judge's analysis disclose few details about the circumstances of the segregation, but it appears to be undisputed that the plaintiff was subjected to significant restrictions on privileges such as day room and yard access, telephone contacts, free movement outside the housing unit, and frequency of showers. The plaintiff asserts that she was held in segregation for 30 months. However, that position is not supported by the record. The disciplinary records show that the plaintiff was placed on a "mental health management plan" starting in January 2015, which was at most 16 months

after her placement in segregation in September 2013.  After January 2015, she received favorable

monthly reviews of her progress, which included step-wise grants of increased privileges each

month, with the stated goal of returning her to the full privileges of Security Level IV general

population placement if she remained well-behaved.  The plan concluded successfully with the

plaintiff's return to general population placement in March 2016.  Based on that undisputed record,

the plaintiff was subjected to, at most, 16 months of the full regimen of administrative segregation

restrictions, and thereafter her privileges gradually were restored at monthly intervals.

Still, 16 months is a significant period of curtailed privileges.  The magistrate determined

that the detention was "atypical" because it was not "justified."  Her analysis focused on

distinguishing the circumstances in this case from *Jones v. Baker*, 155 F.3d 810 (6th Cir. 1998), in

which the Sixth Circuit held that a lengthy segregation was not atypical and significant due to

attendant circumstances that prompted the placement.  *Id.* at 812-13.  In that case, the plaintiff was

implicated in killing a prison guard, and he was held in administrative segregation for 30 months

while the case was being investigated.  Although the court suggested that the length of the

segregation was "atypical," it found that it was "justified."  "When a prisoner is implicated in the

killing of a prison guard during a large prison riot, it is not unreasonable for corrections officials

to make some adjustment in the conditions of his or her imprisonment until a full and thorough

investigation is completed."  *Ibid.*

The magistrate judge in this case found that *Jones* was unhelpful to the defendants'

immunity defense because in that case the need for the extended placement was justified by an

ongoing investigation into the plaintiff's alleged participation in a prison riot.  She believed that

segregating the plaintiff "for general concerns over prison safety" was not a sufficient justification.

That reasoning, however, can be called into question by other decisions in which the Sixth Circuit

has concluded that concerns about a prisoner's violent behavior and accompanying risks to other prisoners and staff can justify an otherwise atypically lengthy placement in segregation.  *E.g.*, *Jones v. Raye*, No. 12-6568, 2014 WL 10319865, at *2 (6th Cir. June 3, 2014) ("[W]e conclude that the district court properly denied Jones's due-process claim. While the duration of Jones's segregation — two and one-half years — may have been atypical, the serious injuries to the corrections officers constituted a good reason for the length of his stay.") (citing *Jones v. Baker*, 155 F.3d 810, 812-13 (6th Cir. 1998)).

Also germane to this case is the well settled rule that federal courts "must accord substantial deference to the professional judgment of prison administrators, who bear a significant responsibility for defining the legitimate goals of a corrections system and for determining the most appropriate means to accomplish them."  *Overton v. Bazzetta*, 539 U.S. 126, 132 (2003).  In this case, the defendants were confronted with the problem of how to deal with an inmate who had demonstrated over more than a decade a tendency toward increasingly violent and recidivist violations of prison regulations by repeatedly assaulting other prisoners.  Between 2000 and 2009, the plaintiff committed seven assaults on other prisoners.  She received increasingly lengthy placements in administrative segregation, which did not deter her from committing further assaults, in several instances soon after her release from segregation.  At least three of the assaults involved the use of improvised weapons and caused serious injuries requiring medical attention or hospitalization.  Moreover, the pattern of behavior showed an escalation of violence in the attacks from throwing scalding hot water in another inmate's face to slashing attacks with razors.  Before the 2013 placement, the plaintiff had received increasingly lengthy terms in segregation, up to eight months for the 2009 attack.  Those placements, although successful in preventing further violence by the plaintiff while the plaintiff was in restrictive custody, did not deter her from

committing another slashing assault in 2013.  Reasonable officials in the defendants' positions would not have been on notice that placing such an inmate in segregation for between 16 and 30 months was a constitutionally problematic solution to address the serious safety risks posed by the plaintiff's behavior under less restrictive conditions.  *See Underwood v. Luoma*, 107 F. App'x 543, 545 (6th Cir. 2004) ("[C]ourts are reluctant to second-guess prison authorities' decisions concerning security risks. As the district court properly noted, prison authorities could have concluded that Underwood's assault of a civilian prison employee necessitated his continued segregation from the general prison population.") (citing *Block v. Rutherford*, 468 U.S. 576, 588 (1984)) (dismissing Fourteenth Amendment claim based on alleged classification to administrative segregation for 13-1/2 years).

The plaintiff's prison record shows a history of progressive discipline in response to her escalating violence.  Segregation for 16 months followed by the gradual return of privileges cannot be said to constitute an atypical approach to the problem the plaintiff posed to prison officials. Certainly, the plaintiff has not cited a case that suggests that it was in the context of the facts here. The plaintiff's liberty interest was not clearly established.

### 2.

The magistrate judge also found that there were questions of fact about whether the monthly reviews of the plaintiff's placement were merely perfunctory "rubber stamp" affirmations of the placement without serious reconsideration.  However, there is abundant evidence in the administrative record that supported the defendants' findings that the plaintiff's behavior posed a serious and ongoing safety risk based on her previous commission of eight violent assaults on other prisoners, and that, as a result of those incidents, she had demonstrated an inability to be managed safely in the general population.  Even if the monthly reviews were perfunctory in nature, no

- 14 -

extensive analysis or reconsideration was required to reach a finding that the plaintiff's past violent behavior, and the fact that she had been undeterred from committing violent attacks by prior terms in segregation up to eight months amply justified the longer placement of 16 to 30 months in this case.  Terms of segregation ranging up to two years, and far longer, have been held not to implicate due process rights in light of similarly violent behavior by inmates that prompted the segregation. *E.g.*, *Merchant v. Hawk-Sawyer*, 37 F. App'x 143, 146 n.1 (6th Cir. 2002) (finding no due process violation where the inmate was detained in administrative segregation from June 1999 through March 2001 for assaulting another inmate and then committing a second assault while in detention).  There is no clearly established law holding that, after having determined that years of escalating violent behavior justified placement in restrictive custody, prison officials are obligated at the first sign of compliant behavior by an inmate either to reclassify her back to the general population or else periodically to find fresh justifications for continued segregation.  Such a rule would be illogical by essentially holding that the *success* of a restrictive placement in preventing the repetition of violence and producing compliant behavior by an inmate would mandate forthwith the *relaxation* of the very restrictions that were necessary to achieve a safe and peaceful custodial environment.

Moreover, it is undisputed that the plaintiff's placement was reviewed on a monthly basis throughout her segregation.  The plaintiff's position that her reviews were merely "sham" proceedings or pretext for indefinite segregation is belied by the undisputed record showing that the monthly reviews resulted in expansions of her privileges periodically starting from January 2015.  Where a prisoner's placement is subjected to such periodic reviews, all requisites of post-placement due process fully are satisfied.  *Williams v. Vidor*, 67 F. App'x 857, 859-60 (6th Cir. 2003) ("[T]he district court properly granted summary judgment to the defendants on Williams's

claim that they denied him meaningful review of his classification status and used the reviews as a pretext for indefinite segregation.  It is undisputed that Williams's classification status has been reviewed monthly.  A prisoner who has assaulted prison staff presents an obvious security risk, and courts are loathe to second-guess prison authorities' decisions concerning such matters. Because Williams receives periodic reviews of his classification, his confinement in administrative segregation does not violate his due process rights.") (citing *Block v. Rutherford*, 468 U.S. 576, 588 (1984); *Hewitt v. Helms*, 459 U.S. 460, 477 n.9 (1983)).  There is no constitutional mandate for any especially elaborate or thorough procedure in such periodic reviews, nor is there any requirement that reviewing officials must gather or present fresh evidence before deciding to continue a placement based on their evaluation of past, established facts.  *See*, for example, *Hewitt*, where the Supreme Court explained:

> Of course, administrative segregation may not be used as a pretext for indefinite confinement of an inmate. Prison officials must engage in some sort of periodic review of the confinement of such inmates. This review will not necessarily require that prison officials permit the submission of any additional evidence or statements. The decision whether a prisoner remains a security risk will be based on facts relating to a particular prisoner — which will have been ascertained when determining to confine the inmate to administrative segregation — and on the officials' general knowledge of prison conditions and tensions, which are singularly unsuited for 'proof' in any highly structured manner. . . . [T]he ongoing task of operating the institution will require the prison officials to consider a wide range of administrative considerations . . . . The record plainly shows that on January 2 a Program Review Committee considered whether Helms' confinement should be continued[.] This review, occurring less than a month after the initial decision to confine Helms to administrative segregation, is sufficient to dispel any notions that the confinement was a pretext.

459 U.S. at 477.

Finally, the record also discloses that for the first two months during her placement in segregation, the plaintiff declined weekly opportunities to participate in discussions with the Security Classification Committee about her placement.  The refusal to avail herself of opportunities to engage in institutional discussions about her placement, by an inmate who

- 16 -

repeatedly had demonstrated a tendency to ignore and violate prisoner conduct regulations, certainly could be viewed by prison officials as supplying fresh grounds for an ongoing concern about the sincerity of any expressed intent by the plaintiff to behave in a peaceful manner after release from segregation.

The plaintiff's argument in support of her due process claim focuses on alleged delays and missteps in the periodic review process and her contention that the monthly reviews merely were "rubber stamp" continuances of the segregation placement without serious reconsideration by prison officials. She highlights admissions by defendant Armstrong that there were essentially no explicit guidelines in place for determining when to return a prisoner to the general population. She also alleges that verbal representations by several of the involved defendants that a return to general population placement would be forthcoming never materialized because of changes in personnel or lack of action by supervisors or successors of officials who had expressed favorable views about the plaintiff's reclassification. However, it is well settled that even a total failure of orderly compliance with the placement review process cannot sustain a due process claim in the prison disciplinary context. *Underwood*, 107 F. App'x at 545 ("The district court properly held that any denial of Underwood's periodic reviews does not violate his due process rights. No due process interest can be derived from a statute or regulation that merely establishes procedural requirements. The state did not create an independent substantive right merely by establishing procedures for periodic reviews.") (citing *Olim v. Wakinekona*, 461 U.S. 238, 250-51 (1983)); *see also Williams*, 67 F. App'x at 859 ("[T]he district court properly granted summary judgment to the defendants on Williams's due process claims. Williams's placement and continued confinement in administrative segregation did not implicate a protected liberty interest. Moreover, even if they did, he received the process to which he was entitled. Contrary to Williams's

assertions, prison administrative regulations and policy did not require a hearing to place Williams in administrative segregation once Williams was found guilty of a major misconduct violation.").

The plaintiff also alleges that several grievances she filed seeking reclassification unreasonably were denied or mishandled by prison officials. But it is equally settled that prisoners do not have a due process right to an effective prison grievance procedure. *Graham v. Chicowski*, No. 18-2049, 2019 WL 4381841, at *5 (6th Cir. May 3, 2019) ("Graham was not constitutionally entitled to notice and a hearing before being put on toplock, and even if the defendants did thwart Graham's ability to file a grievance, he did not have any due process right to an effective grievance procedure.").

\* \* \*

The defendants' decision to place the plaintiff in administrative segregation due to the safety risk posed by her behavior — eight serial assaults committed by the plaintiff over more than a decade in custody — amply was supported by the history of violent assaultive behavior demonstrated by prison disciplinary records. The plaintiff has not identified any clearly established law that supports her argument that the periodic placement reviews performed in this case were not meaningful or adequate to satisfy the requirements of the Due Process Clause in the context of this case. The defendants, therefore, are entitled to qualified immunity on the plaintiff's Fourteenth Amendment claim.

III.

The conduct of the defendants that is challenged by the complaint did not violate any clearly established law, and all of the defendants therefore are entitled to qualified immunity. The defendants' objections to the recommendation to deny their motion for summary judgment based on qualified immunity are well founded.

Accordingly, it is **ORDERED** that the report and recommendation (ECF No. 74) is **REJECTED**, and the defendants' objections (ECF No. 75) are **SUSTAINED**.

It is further **ORDERED** that the defendants' motion for summary judgment (ECF No. 67) is **GRANTED**.

It is further **ORDERED** that the amended complaint in its entirety is **DISMISSED WITH PREJUDICE**.

s/David M. Lawson
DAVID M. LAWSON
United States District Judge

Dated:  March 31, 2022